J-A06008-18

2018 PA Super 114

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ROBERT BEBOUT, | |
| Appellant | No. 1080 WDA 2017 |

Appeal from the Judgment of Sentence Entered May 22, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0003509-1981

BEFORE:  BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.*

OPINION BY BENDER, P.J.E.:                    **FILED MAY 4, 2018**

Appellant, Robert Bebout, appeals from the judgment of sentence of a minimum term of 45 years' incarceration, and a maximum term of life imprisonment ("45-life"), imposed following his resentencing pursuant to ***Miller v. Alabama***, 567 U.S. 460 (2012), and ***Montgomery v. Louisiana***, 136 S.Ct. 718 (2016).[1]  Appellant challenges both the legality and the discretionary aspects of his sentence.  After careful review, we affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] In **Miller**, the Supreme Court of the United States "held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole [("LWOP")] absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." **Montgomery**, 136 S.Ct. at 725.  Subsequently, in **Montgomery**, the Court held that the **Miller** decision "announced a substantive rule of constitutional law" that applies retroactively. **Id.** at 736.

In 1981, Appellant, who was then only 15 years old, anally raped, beat with a brick, strangled, and ultimately murdered a seven-year-old boy in the West End section of Pittsburgh, leaving the child's nude body in the Saw Mill Run Creek. When police arrested Appellant several days later, he quickly confessed to the crime. On April 5, 1982, a jury convicted him of second-degree murder, and the trial court sentenced him to a mandatory term of LWOP. This Court affirmed his judgment of sentence on direct appeal. *Commonwealth v. Bebout*, 484 A.2d 130 (Pa. Super. 1984). Appellant did not file a petition for allowance of appeal with our Supreme Court from our decision.

Appellant first filed for collateral relief in 1985, under the Post Conviction Hearing Act (PCHA), 42 Pa.C.S. §§ 9541-9551 (repealed April 13, 1988). The PCHA court denied Appellant's petition on February 5, 1986. He appealed, and after this Court affirmed that decision on December 4, 1986, Appellant did not seek further relief in our Supreme Court. *See Commonwealth v. Bebout*, 520 A.2d 1211 (Pa. Super. 1986) (unpublished memorandum). Appellant filed his second PCHA petition on January 12, 1988. The PCHA court denied that petition on March 9, 1988, and it does not appear that Appellant appealed from that decision. However, he filed his third PCHA petition, this time *pro se*, on November 2, 1988. The PCHA court denied that petition on August 28, 1989. Again, Appellant does not appear to have appealed from that decision.

Appellant filed his fourth petition for collateral relief, this time under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.*, on June 22, 2010. Appellant received appointed counsel who filed an amended petition on his behalf. In that petition, Appellant sought relief under the auspices of *Graham v. Florida*, 560 U.S. 48 (2010) (holding that the Eighth Amendment prohibits LWOP sentences for juveniles who did not commit homicide). On March 16, 2011, the PCRA court filed a notice of its intent to dismiss the petition under Pa.R.Crim.P. 907 and, on June 15, 2011, the court dismissed Appellant's petition. The PCRA court filed an amended dismissal order on July 25, 2011. On September 16, 2011, the court issued an order reinstating Appellant's appellate rights *nunc pro tunc* from the June 15, 2011 order. This Court affirmed the denial of Appellant's PCRA petition on May 10, 2012, and his subsequent petition for allowance of appeal to our Supreme Court was denied on November 28, 2012. *Commonwealth v. Bebout*, 50 A.3d 239 (Pa. Super. 2012) (unpublished memorandum), *appeal denied*, 57 A.3d 65 (Pa. 2012).

Appellant filed his fifth petition for collateral relief, his second PCRA petition, on January 17, 2013. Therein, Appellant sought resentencing pursuant to *Miller*. While that petition was pending in the PCRA court, our Supreme Court issued its decision in *Commonwealth v. Cunningham*, 81 A.3d 1 (Pa. 2013), holding that the rule announced in *Miller* did not apply retroactively to cases on collateral review. On this basis, the PCRA court denied Appellant's second PCRA petition on April 21, 2014. This Court

affirmed on September 30, 2014, and our Supreme Court denied further review on January 28, 2015. *Commonwealth v. Bebout*, 107 A.3d 240 (Pa. Super. 2014), *appeal denied*, 108 A.3d 33 (Pa. 2015).

On January 25, 2016, the Supreme Court of the United States decided *Montgomery*, which effectively reversed the Pennsylvania Supreme Court's decision in *Cunningham*. Appellant promptly filed a *pro se* PCRA petition on February 18, 2016, his third PCRA petition, and his sixth petition for collateral relief. The PCRA court appointed counsel, who then filed an amended PCRA petition on June 3, 2016. The Commonwealth filed an answer on June 30, 2016, conceding that Appellant should be resentenced pursuant to *Miller* and *Montgomery*. On October 31, 2016, the PCRA court issued an order granting resentencing, which ultimately occurred on May 17, 2017. Subsequently, on May 22, 2017, the PCRA/resentencing court issued an order granting Appellant's PCRA petition, vacating his LWOP sentence, and imposing a new sentence of 45-life, with time-credit for 13,154 days served. Appellant filed a timely post-sentence motion on May 31, 2017, which the PCRA/resentencing court denied on June 27, 2017. Appellant then filed a timely notice of appeal on July 26, 2017, and a timely, court-ordered Pa.R.A.P. 1925(b) statement on September 27, 2017. The PCRA/resentencing court filed its Rule 1925(a) opinion on October 6, 2017.

Appellant now presents the following questions for our review:

In view of the applicable legal standards and mitigation evidence introduced by [Appellant], did the resentencing court commit legal error by sentencing [him] to [45-life]?

- 4 -

In view of the applicable legal standards and mitigation evidence introduced by [Appellant], did the resentencing court abuse its discretion by sentencing [him] to [45-life]?

Appellant's Brief at 4.

We begin by addressing Appellant's first claim, wherein he asserts that his sentence of 45-life constitutes "the functional equivalent" of LWOP, or a *de facto* LWOP sentence, because the minimum sentence "exceeds [Appellant]'s life expectancy in prison…." ***Id.*** at 22-23. Appellant also argues that, because the lower court determined that he was not eligible for LWOP, his *de facto* LWOP sentence does not provide a meaningful opportunity for release as is ostensibly required under ***Miller*** and ***Montgomery***.

> A challenge to the legality of a particular sentence may be reviewed by any court on direct appeal; it need not be preserved in the lower courts to be reviewable and may even be raised by an appellate court *sua sponte*. ***Commonwealth v. Barnes***, … 151 A.3d 121, 124 ([Pa.] 2016); ***see also Montgomery***, 136 S.Ct. at 731 (stating that because "[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void[, i]t follows, as a general principle, that a court has no authority to leave in place a conviction or sentence that violates a substantive rule") (citing ***Ex parte Siebold***, 100 U.S. 371 … (1879)). As we have previously explained, our decisions pertaining to questions of sentencing illegality "have not always been smooth," with "complexities" arising "from disagreement among the members of the Court concerning whether a particular claim implicates the legality of a sentence." ***Commonwealth v. Spruill***, … 80 A.3d 453, 460–61 ([Pa.] 2013). There is no dispute, however, that a claim challenging a sentencing court's legal authority to impose a particular sentence presents a question of sentencing legality. ***See, e.g.***, ***Commonwealth v. Vasquez***, … 744 A.2d 1280, 1282 ([Pa.] 2000) (question of "whether the trial court had the authority to impose a statutorily mandated fine" is a challenge to sentencing legality); ***Commonwealth v. Shiffler***, … 879 A.2d 185, 189 ([Pa.] 2005) (claim regarding the court's authority to

impose a particular sentence implicates the legality of the sentence); *In re M.W.*, … 725 A.2d 729, 731 ([Pa.] 1999) (same).

*Commonwealth v. Batts*, 163 A.3d 410, 434–35 (Pa. 2017).

Recently, in *Commonwealth v. Foust*, --- A.3d ----, 2018 WL 988904 (Pa. Super. filed February 21, 2018),[2] a panel of this Court held that "a trial court may not impose a term-of-years sentence, which constitutes a *de facto* LWOP sentence, on a juvenile offender convicted of homicide unless it finds, beyond a reasonable doubt, that he or she is incapable of rehabilitation." *Id.* at *11. The panel then considered whether Foust's aggregate sentence of 60 years to life (composed of two, consecutive terms of 30 years to life) constituted a *de facto* LWOP sentence. In conducting this analysis, the *Foust* Court first had to determine whether to analyze aggregate sentences or the individual components thereof. After determining that our sister states were split on this question, the panel ultimately decided to side with the states that had adopted the individual-sentence approach. *Id.* at *13. The panel arrived at that decision based, in part, on well-settled principles of Pennsylvania sentencing law, and on the analysis provided in *McCullough v. State*, 168 A.3d 1045 (Md. Spec. App. 2017), *cert. granted*, 171 A.3d 612 (Md. 2017). *See Foust*, 2018 WL 988904 at *14-*15.

The *Foust* Court then considered whether either of the appellant's 30 years to life sentences constituted a *de facto* LWOP sentence, and concluded that they did not. However, the panel "explicitly decline[d] to draw a bright

---

[2] *See* 1118 WDA 2016, filed as 2018 Pa.Super. 39.

line … delineating what constitutes a *de facto* LWOP sentence and what constitutes a constitutional term-of-years sentence." *Id.* at *15. The Court "similarly decline[d] to set forth factors that trial courts must consider when making this determination, *i.e.*, whether they must look to the life expectancy of the population as a whole or a subset thereof and whether the defendant must be given a chance at a meaningful post-release life." *Id.* However, the Court did provide some guidance, as follows:

> There are certain term-of-years sentences which clearly constitute *de facto* LWOP sentences. For example, a 150–year [minimum] sentence is a *de facto* LWOP sentence. Similarly, there are clearly sentences which do not constitute *de facto* LWOP sentences. A sentence of 30 years to life falls into this category. We are unaware of any court that has found that a sentence of 30 years to life imprisonment constitutes a *de facto* LWOP sentence for a juvenile offender. Even the study with the shortest life expectancy for an offender in [the a]ppellant's position places his life expectancy at 49 years, *i.e.*, beyond 30 years.

*Id.* Accordingly, the **Foust** Court determined that a "sentence of 30 years to life imprisonment does not constitute a *de facto* LWOP sentence which entitles a defendant to the protections of **Miller**." **Id.**

Instantly, Appellant's 45-life sentence falls between the "clearly" constitutional and unconstitutional parameters suggested by the **Foust** Court. We note, however, that the **Foust** Court's choice of a 150-year minimum sentence appears to be merely illustrative. Undoubtedly, the Court intended to suggest a sentence that clearly exceeded human life expectancy in absolute terms, rather than average life expectancy, or the life expectancy of some identifiable subset of the population. In that regard, the **Foust** Court could

just have easily listed 120-year or 100-year minimum sentences as examples of what "clearly" constitutes a *de facto* LWOP sentence, as the number of humans who could possibly survive their minimum sentence would be virtually nil. The key factor in considering the upper limit of what constitutes a constitutional sentence, in this narrow context,[3] appears to be whether there is "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." ***Graham***, 560 U.S. at 75. Implicit in this standard is the notion it would not be meaningful to provide an opportunity for release based solely on the most tenuous possibility of a defendant's surviving the minimum sentence imposed. To be meaningful or, at least, ***potentially*** meaningful, it must at least be ***plausible*** that one could survive until the minimum release date with some consequential likelihood that a non-

_____

[3] To be absolutely clear, the context of which we speak is limited to a juvenile sentenced or resentenced in compliance with ***Miller***'s procedural demands, but who has ***not*** been determined to be the "exceedingly rare and uncommon juvenile whose crime reflects his permanent incorrigibility[, and] who therefore may be constitutionally sentenced to life without the possibility of parole." ***Batts***, 163 A.3d at 450 (citing ***Montgomery***, 136 S.Ct. at 726, and ***Miller***, 567 U.S. at 479-80). ***Miller*** expressly permits LWOP sentences on such a finding, and its predecessor, ***Graham***, was a case dealing exclusively with non-homicide offenses. Here, however, by its very nature, the sentence imposed did not reflect a finding of permanent incorrigibility by the sentencing court. ***Miller*** would become meaningless if a sentencing court could issue a *de facto* life sentence to a juvenile homicide defendant, while simultaneously failing to find that that juvenile defendant is permanently incorrigible; this much is clear. Nevertheless, defining what constitutes a *de facto* life sentence will be a difficult question for the courts to address long into the future. The one thing this Court can point to that will *likely* be an integral part of that question will be whether the promise of the opportunity for release on parole is meaningful.

trivial amount of time at liberty awaits. Thus, though it expressly declined to do so, the **Foust** Court seemed to suggest some sort of meaningful-opportunity-for-release standard by declaring that a 150-years-to-life sentence constitutes a *de facto* LWOP sentence. If it had any other standard in mind for making that determination, the **Foust** Court's analysis omitted it.

Instantly, Appellant was sentenced to 45-life, and he has already been incarcerated for this crime since he was 15 years old. Accordingly, Appellant will be eligible for parole when he is 60 years old. Appellant argues that this constitutes a *de facto* life sentence because some studies have suggested that a very narrow subset of the population—individuals sentenced to life imprisonment as juveniles in Michigan—have an average life expectancy of 50.6 years. Appellant's Brief at 24. However, Appellant also cites to the Supreme Court of Connecticut, which recently noted that "government statistics indicate that the average life expectancy for a male in the United States is seventy-six years." **Id.** at 25 (quoting **Casiano v. Commr. of Correction**, 115 A.3d 1031, 1046 (Conn. 2015)). The Commonwealth argues, and Appellant does not appear to dispute, that this data was not made part of the record in this case. We agree.

Nevertheless, we would not find such data helpful to our analysis, except in the most general sense. By one measure, Appellant has already served an *average* lifetime. By the other, if paroled at his minimum or soon thereafter, Appellant potentially has the better part of two decades to live outside of prison before reaching *average* life expectancy. The latter figure certainly

appears to suggest Appellant's opportunity for release is meaningful, or, at least, that his potential to survive his minimum sentence is not trivial. The problem with Appellant's arguments, however, even if he had submitted such data as evidence to the sentencing court, is that he is not offering a workable standard to this Court as to what constitutes a *de facto* life sentence. Appellant seems to suggest we should use data from a very narrow population of juvenile lifers in Michigan to craft a standard. Why not seek out data from an even narrower population, such as from white, male juvenile lifers from Western Pennsylvania who have already survived into their 50s, and who have comparable health statuses to Appellant? One could easily imagine that life expectancy data could fluctuate drastically in either direction as each new variable further narrows the studied population. As becomes abundantly clear, the problem with the sort of statistical analysis suggested by Appellant is that it is not at all discernable which statistics we can rely on to predict life expectancy in specific cases, and we are virtually certain to have a standard that is in constant flux with the addition of each new study.

An equally problematic concern is what we do with such statistics. It is not immediately apparent how the courts should translate average life expectancy data into a *de facto* LWOP sentence standard, and Appellant has not even suggested how we would do it. Certainty, or near certainty, that one will survive his or her minimum sentence is a useless standard. One cannot be certain to survive any sentence, however short. Should, then, the constitutional maximum term of the imposed minimum sentence be half the

average life expectancy to provide a meaningful opportunity for release? One quarter? One tenth? The use of statistical analysis of life expectancies to govern a *de facto* LWOP standard appears to create a myriad of new questions without any easy answers, sending us down a constantly evolving rabbit hole from which we may never escape as more and more data arrives. Consequently, even if Appellant had properly admitted into evidence the relevant life expectancy statistics that he now raises in his brief, it is not evident how helpful they would have been to the construction of a standard for what constitutes a *de facto* LWOP sentence, or how such data dictates a result in this case.

Thus, we turn to our limited case law for guidance, in the absence of a better standard. Appellant's sentence does not fall into the category of sentences described in **Foust**; that is, his minimum sentence is not so long that it is virtually certain that he could not survive it. Indeed, it is at least plausible, and perhaps even likely, that Appellant could live many years past his earliest possible release date.

Appellant argues that delaying parole until old age in these circumstances (**see** footnote 3, *supra*), constitutes a constitutional violation because, ostensibly, it would not provide for a meaningful opportunity for release. **See** Appellant's Brief at 26 (citing **Bear Cloud v. State**, 334 P.3d 132 (Wyo. 2014), and **State v. Null**, 836 N.W.2d 41 (Iowa 2013)). Neither **Bear Cloud** nor **Null** are controlling in this jurisdiction, and we find their analyses unpersuasive at this time. Indeed, we consider Appellant's

opportunity for release to be meaningful, especially in light of the gravity of his crime, because he has the *potential* to live for several decades outside of prison if paroled at his minimum.[4]

Thus, based on the record and arguments before us, we conclude that Appellant has simply failed to meet his burden of demonstrating that the lower court sentenced him to a *de facto* LWOP sentence. There simply is no comparison between the opportunity to be paroled at 60 years of age and 100+ years of age. The difference is, quite literally, a lifetime. As such, we are not convinced that Appellant's sentence is the functional equivalent of LWOP. Accordingly, Appellant's first claim must fail.

Next, Appellant contends that the trial court abused its discretion by imposing a 45-life sentence, because it failed "to consider anything but [Appellant's] offense." Appellant's Brief at 29. Appellant further argues that rehabilitation, not retribution, is the "paramount consideration in juvenile sentencing." *Id.* at 31. In Appellant's Rule 1925(b) concise statement, however, he presented the following claim:

> 1. The Order constitutes an abuse of discretion and/or clear legal error by the [c]ourt considering all of the facts and circumstances of the case. In light of mitigating factors related to [Appellant]'s youth and upbringing, as well as [Appellant]'s subsequent rehabilitation in the nearly thirty-five years since

---

[4] Appellant appears to have become a model prisoner in the decades since his conviction. *See* N.T. Resentencing, 5/22/17, at 7 ("[Appellant] has made a positive adjustment to prison life. I don't think there is any question about that."). Assuming Appellant continues on that path, he could very likely be paroled at his minimum.

the date of the offense, the sentence of [45-life] deserves reconsideration.

Appellant's Pa.R.A.P. 1925(b) Statement, 9/27/17, at 2 ¶ 1.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Hoch**, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted). Moreover,

[c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. **Commonwealth v. Sierra**, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

[W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. **Commonwealth v. Mann**, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. **Commonwealth v. Paul**, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question

exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra***, ***supra*** at 912-13.

As to what constitutes a substantial question, this Court does not accept bald assertions of sentencing errors. ***Commonwealth v. Malovich***, 903 A.2d 1247, 1252 (Pa. Super. 2006). An appellant must articulate the reasons the sentencing court's actions violated the sentencing code. ***Id.***

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010).

The Commonwealth argues that, because Appellant did not raise them in his Rule 1925(b) statement, he "has waived the claims in his Brief that his sentence was based on the seriousness of his crime, it was disproportionate to his conviction, and it was unduly excessive." Commonwealth's Brief at 21. We agree.

Appellant's claim, as raised in his Rule 1925(b) statement, appears to differ significantly from those claims raised in his brief. In the statement, Appellant essentially argued that the PCRA/resentencing court abused its discretion by failing to consider or give adequate weight to mitigating sentencing factors.[5] In his brief, however, Appellant asserts that the PCRA/resentencing court abused its discretion by failing to make rehabilitation the paramount factor in crafting Appellant's sentence, and by affording too

---

[5] The PCRA/resentencing court suggested that Appellant's failure-to-consider-mitigating-factors claim, as raised in his Rule 1925(b) statement, did not present a substantial question for our review. ***See*** Pa.R.A.P. 1925(a) Opinion, 9/27/17, at 8 (citing ***Commonwealth v. Disalvo***, 70 A.3d 900, 903 (Pa. Super. 2013) ("[A]rgument that the trial court failed to give adequate weight to mitigating factors does not present a substantial question appropriate for our review.")).

- 14 -

much weight to the gravity of Appellant's crime (and/or that the court overvalued retributive principles despite recognizing Appellant's rehabilitative needs). We are compelled to agree with the Commonwealth that Appellant did not present these claims in his Rule 1925(b) statement. Accordingly, they are waived. ***Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."). Thus, the only non-waived claim before this court is whether the PCRA/resentencing court failed to consider, or adequately consider, mitigating sentencing factors. As the court correctly noted in its Rule 1925(a) opinion, (***see*** footnote 5, *supra*), such a claim does not present a substantial question for our review.

Nevertheless, even if Appellant had presented a substantial question for our review in this regard, we would still find his claim meritless. The trial court clearly did consider several mitigating factors when it issued Appellant's sentence. As accurately noted by the Commonwealth, the PCRA/resentencing court reviewed and considered:

> Appellant's Resentencing Memorandum[,] the Defense Mitigation Report prepared by Bianca D'Auria, M.S.W. and her testimony [extensively detailing Appellant's exceptionally abusive childhood, as well as his significant rehabilitative efforts in prison], testimony from three State Correctional Institution employees [attesting to Appellant's current good character and model behavior], Appellant's testimony, the Commonwealth's statement, defense counsel's statement, the trial and original sentencing hearing transcripts, and a letter from a former cellmate of Appellant.

Commonwealth's Brief at 24-25 (footnotes and citations to the record omitted). Indeed, the trial court summarized all of these mitigating factors prior to issuing Appellant's sentence, and it did not appear to discredit any of

the mitigating evidence presented in Appellant's favor. N.T. Resentencing, 5/22/17, at 6-7. The court weighed that mitigating evidence against the gravity of Appellant's crime, and determined that he **was not** a suitable candidate for an LWOP sentence, which most certainly was a favorable determination for Appellant, albeit certainly justified on the record before us. The court then crafted a sentence which permits Appellant to seek parole in less than ten years. We would ascertain no abuse of discretion had Appellant presented a substantial question for our review, as the trial court clearly considered the mitigating evidence. *See Commonwealth v. Eicher*, 605 A.2d 337, 355 (Pa. Super. 1992) (holding that "[b]ecause it [was] apparent from the … sentencing transcript that the sentencing court did not focus solely on the seriousness of the offenses but expressly applied the relevant mitigating factors in fashioning [the] appellant's sentence, we find no merit to [the] appellant's claim that the mitigating factors were ignored or assigned insufficient weight by the lower court").

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2018

- 16 -